In re COSTA AND HEAD LAND COMPANY, an Alabama general partnership, Debtor.

COSTA AND HEAD LAND COMPANY, an Alabama general partnership, Plaintiff,

v.

NATIONAL BANK OF COMMERCE, Defendant.

Civ. A. No. 86–AR–1667–S.

United States District Court, N.D. Alabama, S.D.

Dec. 22, 1986.

John P. Whittington, Susan Salonimer, Berkowitz, Lefkovits, Isom & Kushner, Birmingham, Ala., for plaintiff.

Cathy W. Wright, James L. Goyer, III, W. Percy Badham, John D. Johns, Maynard, Cooper, Frierson & Gale, P.C., Birmingham, Ala., for defendant.

## MEMORANDUM OPINION

ACKER, District Judge.

This cause comes to be heard on appeal from the United States Bankruptcy Court for the Northern District of Alabama. On August 14, 1986, the bankruptcy court entered an order granting a preliminary injunction in favor of the debtor, Costa and Head Land Company, an Alabama general partnership, enjoining National Bank of Commerce from selling, transferring or

otherwise disposing of certain securities in NBC's possession under a pledge agreement executed by the owners of the securities, Nelson H. Head and Beverly P. Head, Jr., who are general partners in Costa & Head but not themselves in bankruptcy. Their securities are hypothecated as collateral for loans which NBC made to Costa & Head which is now seeking reorganization under Chapter 11. NBC seeks review of the bankruptcy court's order pursuant to 28 U.S.C. § 158 and 28 U.S.C. § 1292(a)(1).

### Pertinent Facts

On July 25, 1986, Costa & Head filed its petition under Chapter 11 of the United States Bankruptcy Code. Costa & Head has five general partners, including the Heads. (Tr. 60). Costa & Head is the sole general partner in Costa and Head (Birmingham One) Ltd., a separate Alabama limited partnership. (Tr. 62–63). Birmingham One, in turn, is the sole general partner in Costa and Head (Atrium) Ltd., another Alabama limited partnership. (Tr. 63–64). Birmingham One and Atrium also filed Chapter 11 petitions on July 25, 1986.

Simultaneously with the filing of its petition, Costa & Head filed a complaint seeking to enjoin NBC from taking any collection action against Costa & Head's partners who personally guaranteed loans to Birmingham One and from liquidating the securities pledged as collateral by the Heads. None of the general partners in Costa & Head has filed for bankruptcy. (Tr. 249).

NBC made loans to Costa & Head, to Birmingham One and to Atrium. The Heads pledged to NBC as collateral for the loans to Costa & Head, Birmingham One and Atrium, marketable securities having a value at the time of the bankruptcy adversary hearing of approximately $1,200,000. The total loan amount for which the securities are directly pledged is approximately the value of the securities. The pledge agreements contain cross-collateral provisions so that any proceeds of the securities remaining after the payment of the loans can be applied to the loans NBC made to the other partnerships.

At the hearing the scope of relief originally sought by Costa & Head was narrowed to the seeking of a preliminary injunction preventing NBC from selling the securities pledged by the Heads. (Tr. 55–56). In other words, there was no injunction sought against third-party actions by NBC against individual guarantors or partners. The bankruptcy court entered an order on August 14, 1986, preliminarily enjoining NBC from selling or otherwise disposing of the securities, while allowing the dividends to be received and retained by the Heads.

The opinion and injunction order ostensibly were written by counsel for Costa & Head, because at the close of the hearing the following occurred:

THE COURT: All right. I think the atmosphere here is such that the bank is not going to be happy—

MR. WHITTINGTON: No matter what—

THE COURT:—even if I give them the income.

MR. WHITTINGTON: I assure you that's true.

THE COURT: They are probably going to appeal from any order I make which if I—adverse to them. So, if you will, prepare an order—

MR. WHITTINGTON: All right, sir.

THE COURT:—Granting the injunction. And I suppose it's a temporary injunction.

MR. WHITTINGTON: It's a preliminary injunction.

THE COURT: I don't think you are broadening this now. It's only a temporary injunction?

MR. WHITTINGTON: I think it would be technically a preliminary injunction.

THE COURT: All right. Preliminary injunction.

MR. WHITTINGTON: Yes, sir.

THE COURT: If you will, prepare that order.

## Conclusions of Law

Under bankruptcy Rule 8013, this court reviews the bankruptcy court's findings of fact under the clearly erroneous standard. The bankruptcy court's conclusions of law and "ultimate facts," however, are subject to *de novo* review. The Eleventh Circuit in *In re Fielder*, 799 F.2d 656 (11th Cir.1986), set out the standard as follows:

... this court [the district court] as an appellate court gives deference to all findings of fact by the fact finder if based upon substantial evidence, but freely examines the applicable principles of law to see if they were properly applied and freely examines the evidence in support of any particular finding to see if it meets the test of substantiality.

*Id.* at 657.

*See also Bolton v. Murray Envelope Corp.*, 493 F.2d 191, 195 (5th Cir.1974).

There is a slightly more jaundiced appellate look at findings of fact which are prepared by a litigant and rubber stamped by the court:

... under *Louis Dreyfus and Cie. v. Panama Canal Co.*, 5 Cir.1962, 298 F.2d 733, this Court can take into consideration the district court's lack of personal attention to factual findings in applying the 'clearly erroneous' rule. This Court has expressed its disapproval of a district court's mechanical adoption of the proposed findings of fact of a party. *See Lorenz v. General Steel Products Co.*, 5 Cir.1964, 337 F.2d 726, 727 n. 3; *George W. Bennett Bryson & Co., Ltd. v. Norton Lilly & Co.* [5 Cir.1974, 502 F.2d 1045]; Wright and Miller, Federal Practice and Procedure § 2578 at pp. 705–708 (1971). As we observed in *Louis Dreyfus*, 'the appellate court can feel slightly more confident in concluding that important evidence has been overlooked or inadequately considered' when factual findings were not the product of personal analysis and determination by the trial judge.

*James v. Stockham Valves & Fittings Co.*, 559 F.2d 310, 314 n. 1 (5th Cir.1977).

The automatic stay provided in 11 U.S.C. § 362 of the Bankruptcy Code is not applicable in this case. The bankruptcy court granted its injunction by invoking 11 U.S.C. § 105. Section 105(a) provides in pertinent part that "[t]he bankruptcy court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." The bankruptcy court's broad powers under this section are analogous to those of a court of equity when the bankruptcy court is acting to protect the bankruptcy estate. *In re Davis*, 730 F.2d 176, 183 (5th Cir.1984). As applied to the facts of this particular case, the weight of authority supports the proposition that under § 105 a bankruptcy court may enjoin a creditor from executing against the assets of an individual partner of a bankrupt partnership if necessary to protect the bankruptcy estate. *See, e.g., Noel Manufacturing Co. v. Marathon Manufacturing Co.*, 69 B.R. 120 (N.D.Ala. 1985); *In re Old Orchard Investment Co.*, 31 B.R. 599 (W.D.Mich.1983); *In re Northlake Building Partners*, 41 B.R. 231 (Bankr.N.D.Ill.1984); *In re Lahman Manufacturing Co.*, 33 B.R. 681 (Bankr.D.S.D. 1983); *In re Otero Mills, Inc.*, 21 B.R. 777 (Bankr.D.N.M.), *aff'd*, 25 B.R. 1018 (D.N.M. 1982). *But see In re Aboussie Brothers Construction Co.*, 8 B.R. 302 (E.D.Mo. 1981); *In re Venture Properties, Inc.*, 37 B.R. 175 (Bankr.D.N.H.1984). However, the cases all make it clear that injunctive relief is an extraordinary and drastic remedy with the burden of proof being on the debtor to establish under the traditional requirements that it is entitled to injunctive relief. If the debtor fails to satisfy this burden, the injunction may not issue. *In re Electronic Theatre Restaurants*, 53 B.R. 458, 462–63 (N.D. Ohio 1985); *In re Kalispell Feed and Grain Supply, Inc.*, 55 B.R. 627, 629–30 (Bankr.D.Mont.1985); *In re Keyco, Inc.*, 49 B.R. 507, 509–10 (Bankr.E.D.N.Y.1985); *Mahaffey v. E–C–P of Arizona, Inc.*, 40 B.R. 469, 474 (Bankr.D.Colo.1984); *In re Anje Jewelry Co.*, 47 B.R. 485, 487 (Bankr. E.D.N.Y.1983); *In re Century Machine Tools, Inc.*, 33 B.R. 606, 607 (Bankr.S.D.

Fla.1983); *In re Brookfield Tennis, Inc.*, 29 B.R. 1, 3 (Bankr.E.D.Wis.1982); *In re Landmark Air Fund II*, 19 B.R. 556, 560 (Bankr.N.D.Ohio 1982). After carefully reviewing this record, this court finds that the bankruptcy court's determination that an injunction should issue constitutes an abuse of discretion and is clearly erroneous as not supported by substantial evidence and as based on an incorrect perception of the law.

An injunction is an extraordinary equitable remedy. A preliminary injunction under Rule 65, F.R.Civ.P., may only be granted upon a clear showing by the party seeking relief that all of the elements for its issuance have been met. *United States v. Jefferson County*, 720 F.2d 1511, 1519 (11th Cir.1983). The party moving for a preliminary injunction must show: (1) a substantial likelihood that he will ultimately prevail on the merits; (2) that he will suffer irreparable injury unless the injunction issues; (3) that the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) that the injunction, if issued, will not be adverse to the public interest. *Zardui-Quintana v. Richard*, 768 F.2d 1213, 1216 (11th Cir.1985); *Callaway v. Block*, 763 F.2d 1283, 1287 (11th Cir.1985). Each of these four requisites is essential to the movant's case, and the burden of persuasion is at all times upon the movant. *United States v. Jefferson County*, 720 F.2d 1511, 1519 (11th Cir.1983).

### Probability of Success

As applied in adversarial bankruptcy proceedings, it may be possible to satisfy the first of these requirements by a showing that there is a "probability of successfully effectuating a plan of reorganization." *In re Arrow Huss, Inc.*, 51 B.R. 853, 858 (Bankr.D.Utah 1985). This court can find no decision by the Eleventh Circuit, or the old Fifth Circuit, or the Supreme Court enunciating this principle, but assumes its correctness for the sake of this analysis. The bankruptcy court here concluded there is a reasonable likelihood that Costa & Head, Birmingham One and Atri-

um will all be able successfully to reorganize. This conclusion of "ultimate fact" that all three entities will probably be successfully reorganized, in view of the historic ratio of Chapter 11 successes to failures, tests credulity. The record here indicates that Costa & Head's prospects for reorganization are highly uncertain and problematical. In its order, the bankruptcy court was ambivalent on the subject to say the least. It said:

> In the case at hand, the parties of the debtor partnership must either find new capital to finish their project or throw up their hands and give up. That new capital may only be available in the form of their own personal assets. Unlike the debtor's real estate holdings, the stock pledged to the bank can be readily liquidated at an ascertainable market value. The debtor may propose to provide the bank with adequate assurance under 11 U.S.C. § 363 of the payment of its debt and thereby loose the stock at issue here so as to use it to generate the necessary capital. In a case of this magnitude, it is much too soon to make that decision or effectively evaluate all alternatives. The debtor should not be foreclosed from that alternative at this early date when the consequence may be failure of the debtor to reorganize and no payment to unsecured creditors and irreparable harm to the bankruptcy estate.

Furthermore, during the hearing which led to the injunction, the bankruptcy court recognized the dismal prospects for a successful reorganization in the following graphic language:

> [THE COURT]: Whether this thing is filed in good faith—Frankly, I think that Costa & Head went about this thing backwards, apparently did. You don't build things until you get leases. The idea that you are going to force the City of Birmingham to absorb a certain amount of lease property is ridiculous, ridiculous. I have been around Birmingham a long time. I guess you have. I know Mr. Head has. And we know that

Birmingham has its limitations, even downtown Birmingham.

I'm going to make a statement that you all might object to. I say this was a pie in the sky scheme, pie in the sky. Maybe so.

\* \* \* \* \* · \*

THE COURT: Maybe it wasn't. Right now to me it is impractical, impossible and irrational, irrational.

\* \* \* \* \* \*

The idea that you can force or sell business firms in Birmingham to pay twice as much rent as they are used to paying, because they are going to have a fancy office and then—am I talking the wrong ideas—to me was a false idea. Somebody made a mistake. You have to pay for it. There's no answer to it. You have to.

Tr. at 144–45.

After expressing these severe doubts, which clearly contradict the ultimate finding of a probability of success, the bankruptcy court (or counsel for Costa & Head?) attempted to sidestep the doubts by a finding that NBC may be oversecured. The bankruptcy court gave Costa & Head the benefit of every doubt, and by doing so it effectively relieved Costa & Head of its burden of proving the probability of a successful plan of reorganization. On appeal, Costa & Head nervily argues that it is entitled to present a plan of reorganization in due course (whenever that may be), and makes the startling admission that any attempt at determining the probability of success at this early stage would be mere speculation. *See In re Otero Mills, Inc.,* 21 B.R. 777, 779 (Bankr.D.N.M.) *aff'd* 25 B.R. 1018 (D.N.M.1982). This is a concession which is repugnant not only to the requisites of Rule 65, but to the bankruptcy court's necessary findings. Although the bankruptcy court has broad equitable power under § 105, this power does not include relieving a party of his burden of proving an essential requisite for injunctive relief. The record contains no evidence whatsoever that Costa & Head will, in fact, be able to obtain new capital or that its partners are even willing to inject more money into the partnership, which the bankruptcy court calls "pie in the sky" and "impractical" and "irrational" and "impossible" and "ridiculous." Moreover, the bankruptcy court's determination that the pledged securities can be used in any attempt at a reorganization is clearly erroneous, inasmuch as the full value of the securities will necessarily go toward reducing the debt of Costa & Head, that is, unless Costa & Head is correct in its oral argument to this court when it asserts that the bankruptcy court has the power to substitute collateral so as to relieve the Heads' securities from NBC's lien. What would it substitute, a second or third mortgage on a long empty building? The mere conclusion that NBC may be oversecured, even if supported in the evidence, is not sufficient to meet Costa & Head's burden of proving a "probability of success." NBC has an interest in the pledged securities not only to secure the debt of Costa & Head, but also to secure the debts of the limited partnerships Birmingham One and Atrium. There was no injunction even sought by Birmingham One or Atrium, although their bankruptcy estates are entirely separate under different case numbers. Because the requirements for granting preliminary injunctions apply, Costa & Head must prove that there is a "probability of successfully effectuating a plan of reorganization." *In re Arrow Huss, Inc.,* 51 B.R. 853, 858 (Bankr. D.Utah 1985); *see also In re Electronic Theatre Restaurants Corp.,* 53 B.R. 458, 462 (N.D.Ohio 1985). Not only was there no *substantial* evidence of the feasibility of a reorganization, there was *no* evidence except what the court called "pie in the sky." There was no testimony as to *how* the Heads' personal assets could be used in *any* reorganization plan. Costa & Head's argument that these assets are the "functional equivalent" of the debtor's assets is an argument devoid of meaning.

Bankruptcy Rule 7065 permits a bankruptcy court to enter a preliminary injunction without compliance with the bond provisions of Rule 65(c), F.R.Civ.P. The fact

that the requirement of an injunction bond is waived in an adversary proceeding in bankruptcy magnifies the importance of a careful and factually supported predetermination of the probability of a successful reorganization, and of the "payment in full" of the preliminary enjoined creditor, as opposed to "pie in the sky."

### Irreparable Harm

The second requisite for obtaining a preliminary injunction is for the movant to establish irreparable harm to the bankruptcy estate if the injunction does not issue. *In re Otero Mills, Inc.*, 21 B.R. 777, 779 (Bankr.D.N.M.) *aff'd*, 25 B.R. 1018 (D.N.M. 1982). "Some cases have found the irreparable harm requirement met where failure to enjoin the creditor would adversely or detrimentally influence or pressure the debtor through the nondebtor." *In re Arrow Huss, Inc.*, 51 B.R. 853, 858 (Bankr.D. Utah 1985). Other factors sometimes considered include "whether the action sought to be enjoined would so consume the time, energy and resources of the debtor that it would substantially hinder the debtor's reorganization effort." *In re Anje Jewelry Co.*, 47 B.R. 485, 487 (Bankr.E.D.N.Y.1983). There is little expression from the Eleventh Circuit, the Fifth Circuit or the Supreme Court on the subject. The bankruptcy court here found that the Heads' pledged securities are "available" to the bankruptcy estate under 11 U.S.C. § 363 to use in Costa & Head's reorganization, and that unless NBC is enjoined from liquidating the securities, Costa & Head's efforts to reorganize may be seriously jeopardized and frustrated. The bankruptcy court also found that because the Heads provide management services to the debtor, a forced sale of the securities would adversely affect their ability to manage the partnership's business and to deal with other creditors who may have claims against them as general partners of the debtor. On this rationale, the bankruptcy court concluded that Costa & Head will be irreparably injured if NBC disposes of these securities. Indulging every presumption in favor of the bankruptcy court, this court cannot agree with its logic. The bankruptcy

court's conclusions in this regard constitute an abuse of its discretion, are not supported by substantial evidence, and are contrary to controlling principles of law.

Costa & Head failed to present any evidence that the pledged securities are actually *available* to it and can be used in any realistic or practical way to assist in its reorganization. Assets not owned by a bankrupt can hardly be *used* by the bankrupt. It follows that the bankruptcy court's conclusion that the sale of these securities may jeopardize and frustrate Costa & Head's efforts to reorganize does not meet the test of substantiality. Although Beverly P. Head testified that he personally relies on the dividend income from the securities for his living expenses (Tr. 193–95), this hardly supports any conclusion that the sale of the securities will adversely affect the management of the partnership. The bankruptcy court, during its hearing, itself recognized that this fact was "utterly immaterial" to the reorganization efforts of Costa & Head (Tr. 126–27), and quashed the subpoena by which NBC sought Mr. Head's tax returns. (Tr. 207–12). The record contains no evidence to support the bankruptcy court's holding that the sale of these securities will affect the Heads' ability to deal with other creditors who have claims against the partnership and against them as general partners. If there is any evidence upon which such an inference can be drawn, the possible effect on the bankruptcy estate is so nebulous and so speculative as to go beyond the reach of any decided case cited by the parties. In fact, carrying this logic to its illogical conclusion, the bankruptcy court should have enjoined all collection proceedings against the individual guarantors and partners of Costa & Head's debts because of the bad psychological impact such collection proceedings might have on the guarantors and partners. How can a manager manage when he is under pressure? If the bankruptcy court's reasoning is valid, a bankruptcy court in a partnership's bankruptcy can enjoin a bank from realizing on collateral pledged by a partner for his *per-*

*sonal* loan, having no connection whatsoever with the bankrupt partnership itself, that is, except for his being a partner. This concept stretches beyond the purpose and intent of Chapter 11 or of the entire Title 11.

There is no evidence in the record to indicate that NBC's desire to liquidate these securities constitutes an attempt by NBC unduly to pressure or to oppress the debtor. A mere conclusory allegation by Costa & Head that such action will adversely affect it is insufficient, since in reality all actions taken against general partners may *indirectly* impact the partnership. *In re Juneau's Builders Center, Inc.,* 57 B.R. 254, 258–59 (Bankr.M.D.La.1986). Costa & Head failed to establish by proof that NBC was attempting to pressure the debtor partnership through the Heads. To allege such an intent does not make it so. For aught appearing NBC made its loans to Costa & Head not based on any expectation that the partnership would be successful in its "pie in the sky" development and to repay NBC out of its profits, but relied instead on the personal collateral put up by the Heads. Is NBC to be punished for the intelligence of its loan officers and accused of oppressive tactics when it now reacts in no more than a predictable way? There is simply no evidence in this record to demonstrate that the liquidation of the pledged securities will adversely or detrimentally affect or influence the *bankruptcy estate. In re Otero Mills, Inc.,* 21 B.R. 777, 778 (Bankr.D.N.M.) *aff'd,* 25 B.R. 1018 (D.N.M. 1982); *In re Keyco, Inc.,* 49 B.R. 507, 509–10 (Bankr.E.D.N.Y.1985).

Although the bankruptcy court reached conclusions which it translates into "irreparable harm," this ultimate fact is based on conjecture and speculation, with no facts in the record to support it. *See, e.g., Mahaffey v. E–C–P of Arizona, Inc.,* 40 B.R. 469, 472–73 (Bankr.D.Colo.1984). "Irreparable harm" in this context necessarily implies that if NBC is enjoined, Costa & Head can be saved. The undisputed evidence is that these securities are exclusively owned by two general partners. There is no concrete evidence to show that these securities can in any way be used to save the debtor partnership.

**Balancing the Potential Harm**

If, as this court believes, Costa & Head wholly failed to prove by substantial evidence that it will suffer "irreparable harm" in the event NBC sells the Heads' securities, *a fortiori,* Costa & Head failed to establish that the threatened injury to it outweighs whatever damage the injunction will cause NBC. The bankruptcy court's hopeful conclusion that NBC will suffer no substantial injury as a result of its injunction does not pass the test of substantiality and has more the character of wishful thinking. The pledged securities are now the only realistic source which NBC has for collecting its loans to Costa & Head and some of its loans to Birmingham One. Interest is now accruing at the rate of $3,000 per day, according to the bankruptcy court itself. Is the bankruptcy court going to assure NBC that it will not only collect its interest but the interest due on the accrued but unpaid interest? Apparently not, although NBC does not hold itself out to be a charitable institution. It stays alive on interest. If all of its loan guarantors put their enterprises into bankruptcy under Chapter 11 and NBC is enjoined from realizing on the expressly committed collateral of the individual guarantors, NBC will itself be in receivership soon.

This injunction not only denies NBC its current interest but forces NBC to bear the risk of the fluctuating value of the securities while the loans for which they are pledged are clearly in default. In addition, the dividend income of the securities is continually being dissipated during a period when NBC is clearly entitled to the dividends under the hypothecation agreement. What is the bankruptcy court's justification for this? It articulates none. The purported palliative provision in the order giving NBC the right to seek relief from the injunction in the event of a drop in the market price of the securities is not palliative enough. Who would have the burden of proof on any reopening of the question?

Would a full scale evidentiary hearing after notice be required? NBC, at least in its commercial loan department, is not in the business of speculating on the stock market. It is in the business of lending money, well secured, at a good rate of interest and thereafter collecting the principal and interest according to the terms of the loan documents. Costa & Head, during oral argument to this court, implied that NBC should thank the bankruptcy court because the market value of the securities temporarily went up after the injunction. Would it make the same argument if the bottom had fallen out of the market?

The bankruptcy court's order in fact causes NBC to suffer an actual loss of monies which it is clearly entitled to receive. Thus, the bankruptcy court's finding that the sale of the securities will potentially harm Costa & Head more than NBC is clearly erroneous and contrary to the substantial evidence. *See In re Tom B. Coals, Inc.*, 46 B.R. 245 (D.C.W.Va.1985).

### The Public Interest

The bankruptcy court never made any finding that Costa & Head carried its burden on the fourth element, namely, that the injunction was not adverse to the public interest. Nowhere in its opinion does the bankruptcy court ever mention the words "public interest." The bankruptcy court concluded that an injunction was necessary to protect the integrity of the automatic stay and to prevent a destructive race for assets among other creditors, thereby allegedly frustrating the overall purpose of the bankruptcy laws. And yet everybody agrees that the automatic stay does not apply here. If it doesn't apply, how can it be involved? The court's conclusion, if intended as a finding that the "public interest" will be adversely affected if an injunction *does not* issue (the mirror image of the *requisite* finding that the *issuance of an injunction is not adverse* to the public interest), is also clearly erroneous and not supported by substantial evidence. None of the parties contends that the automatic stay provision in § 362 applies to this case, and the evidence is clear that the securities

are the personal assets of the Heads and are not truly assets of the debtor partnership. Furthermore, no evidence indicates, and it would seem extremely unlikely, that there will be a destructive race for assets among creditors if the injunction is lifted, *because the securities are pledged to NBC.* NBC is the only creditor in this race. It is the only creditor which is or can ever be entitled to this collateral unless it turns out to be worth a whole lot more than anyone thinks it is worth. The injunction deprives NBC of its basic contractual right to realize upon its collateral. The banking and commercial communities have a legitimate right to expect that contracts will be honored and enforced *unless the borrower himself seeks the legitimate protection of the bankruptcy laws.* The Heads have conspicuously not sought such protection. If and when they do, a different question will be presented.

There is, or should be, a distinction between the "public interest" and the "overall philosophy of the Bankruptcy Act." If the bankruptcy court can be said to have found that its injunction will not adversely affect the public interest that finding is no more than an expansion upon the theme that whoever interferes with the affairs of a bankrupt debtor, however tangential or indirect that "interference" may be, trespasses upon the concept of debtor protection and therefore trespasses upon the "public interest." The philosophy of the Bankruptcy Act and the "public interest" do not constitute an absolute and inevitable equation. The words "public interest" are defined in *Black's Law Dictionary* as "something in which the public, the *community at large*, has some *pecuniary* interest, or some interest by which *their legal rights or liabilities are affected*" (emphasis supplied), citing *Russell v. Wheeler*, 165 Colo. 296, 439 P.2d 43, 46 (1968). See also *Goldberg v. Barger*, 37 Cal.App.3d 987, 112 Cal.Rptr. 827, 833 (1974). The bankruptcy court never even analyzed the impact on the "public interest" as that term is properly understood and as it should be applied in this context. If the question is whether or not there is

an adverse affect on the "public interest" for a local bank to have over one million dollars at risk, paying no interest and unavailable for lending to other local entrepreneurs for an indefinite period of time the question remains undiscussed and unanswered. The court takes judicial notice of the fact that no plan of reorganization has been proposed by Costa & Head and, for aught appearing, is not even in rough draft.

### Two Serious Questions of Law

A. The bankruptcy court (or its co-author) employs the ancient case, *Francis v. McNeal*, 228 U.S. 695, 33 S.Ct. 701, 57 L.Ed. 1029 (1913), for the strange proposition that all of the personal assets of a non-bankrupt partner in a bankrupt partnership are subject to administration within the partnership's bankruptcy estate, and therefore that the personal assets of the partners are "functionally" the property of the partnership and thus of its estate. In the first place, *Francis v. McNeal* involved a court-appointed *Trustee* and not a debtor-in-possession. If there had been a Trustee appointed for Costa & Head and if that Trustee were busily engaged in marshalling all of the personal assets of the two Messrs. Head and of the other three partners for eventual distribution to Costa & Head's creditors, there might be some reason for discussing *Francis v. McNeal.* This court deduces from the fact that Costa & Head's bankruptcy petition *does not list among its assets all of the personal assets of its general partners* that Costa & Head is not truly interested in carrying this proposition to its logical conclusion. Such a "breakthrough" proposition is totally inconsistent with the bankruptcy court's agreement with Mr. Head in refusing to allow NBC to subpoena Mr. Head's personal tax returns. It would seem to this court that the personal assets of non-bankrupt partners either *are* assets of the estate or *are not* assets of the estate, without regard to the particular purpose for asking the question as to whose assets they are. This court doubts seriously that they constitute assets of the bankruptcy estate for any purpose here relevant.

B. The bankruptcy court cites 11 U.S.C. §§ 363 and 364 as authority for its injunction. This court cannot figure out how § 364 can form even an arguable basis for such extraordinary relief. It seems that § 105, cited casually by the bankruptcy court in a footnote, forms the only statutory basis for any kind of argument whatsoever for the far-reaching and unprecedented relief granted by the bankruptcy court and from which the bankruptcy court fully expected an appeal. The question, it seems to this court, resolves itself into whether or not § 105 gives the bankruptcy court unbridled discretion when dealing even indirectly with a bankruptcy estate and its third party creditors.

### Conclusion

This court can understand the bankruptcy court's reluctance to pull a card from the house of cards built by outstanding Birmingham businessmen, even if they were visionaries who levitated only to find no pie in their sky. This reluctance may explain the bankruptcy court's willingness to engage in a bit of legerdemain or "judicial legislation" (to use a hackneyed description which the minority on the Supreme Court regularly uses to describe the majority in split opinions). Judges are all inclined to want to "do what is right," but judicial restraint requires an equation between "what is right" and "what the law allows." The law does not allow what the bankruptcy court here did.

A preliminary injunction is an extraordinary and drastic remedy which may be granted only upon a clear showing that the movant has carried its heavy burden *on each and all of the four elements. In re Anje Jewelry Co., Inc.,* 47 B.R. 485, 487 (Bankr.E.D.N.Y.1983). "The movant must make out a clear showing of hardship and adverse impact on the reorganization case *if there is even a fair possibility that the stay will prejudice an adverse party."* (emphasis supplied). *In re Arrow Huss, Inc.,* 51 B.R. 853, 859 (Bankr.D.Utah 1985). There is certainly more than a "fair possibility" here that the injunction will preju-

dice NBC. After careful review of the applicable law and the record, and considering the extraordinary nature of the remedy, this court agrees with the district court in *In re Electronic Theatre Restaurants Corp.*, 53 B.R. 458, 462–63 (N.D.Ohio 1985), when it said:

> [The court] finds that the Bankruptcy Court abused its discretion in applying a less stringent standard for granting the stay against nondebtor parties than is traditionally required for the granting of injunctive relief. Although the language of § 105 broadly allows the bankruptcy courts to issue orders 'necessary and appropriate' to the Chapter 11 proceedings, the necessity and appropriateness of extending stays to nondebtor parties is to be determined solely by applying the traditional tests for issuance of injunctive relief.

The bankruptcy court's finding, express or implied, that Costa & Head satisfied all of the standards for issuance of a preliminary injunction is erroneous. To have allowed Costa & Head to draft the findings here was like a brilliant psychiatrist diagnosing his patient as schizophrenic and then asking the patient to articulate his own prognosis. Accordingly, the order issuing the preliminary injunction is due to be vacated.

### Postscript

During oral argument counsel for NBC stated that subsequent to the injunction there have been stock splits as to some of the Heads' securities, but that the Heads have failed and refused to assist in assuring delivery to NBC of the newly issued stock certificates. Also, NBC introduced into evidence a pleading filed by a general partner of Costa & Head in a separate legal action brought by NBC in a state court against that partner on his guaranty agreement, his defense being his assertion that the Heads' collateral should be taken first by NBC before it can pursue a guarantor personally. These two matters are *dehors* the record and have not been considered by this court in reaching its decision.

The court does take judicial notice of several cases pending *in this court* in which creditors of Costa & Head are seeking to collect from one or more of Costa & Head's guarantors or general partners. This fact raises the question as to why Costa & Head retreated from asking a preliminary injunction of these collection proceedings when such an injunction is arguably just as necessary to protect "the integrity of the automatic stay" as an injunction against the sale of a guarantor's personal collateral. If and when these collection efforts result in judgment liens and there are levies of execution on the assets of individual partners, the creditors will be in a position identical with that of NBC. Perhaps they are waiting until then to seek injunctive relief.

An appropriate separate order will be entered.